UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JOSEPH MEJIA,                                        :

               Plaintiff,                    :            09 Civ. 9656 (AJP)

          -against-                          :            **OPINION AND ORDER**

MICHAEL J. ASTRUE, Commissioner of                   :
Social Security,
                             :
          Defendant.                          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge:**

         Pro se plaintiff Joseph Mejia brings this action pursuant to § 205(g) of the Social

Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of

Social Security ("the Commissioner") denying Mejia Disability Insurance Benefits and Supplemental

Security Income Benefits.  (Dkt. No. 2: Compl.)  The Commissioner has moved for judgment on the

pleadings pursuant to Fed. R. Civ. P. 12(c).  (Dkt. No. 13: Am. Notice of Motion.)  The parties have

consented to decision of this case by a Magistrate Judge pursuant to 28 U.S.C. § 636(c).  (Dkt. No.

6.)

         For the reasons set forth below, the Commissioner's motion for judgment on the

pleadings is GRANTED.

## FACTS

### Procedural Background

On November 2, 2007, Mejia applied for both Social Security Disability Insurance Benefits and Supplemental Security Income Benefits, alleging that he was disabled since October 16, 2007.  (See Dkt. No. 11: Administrative Record Filed by the Comm'r ("R") 74-78, 98.)   In his application, Mejia claimed to suffer from "heart failure" and "high blood pressure."  (R. 28, 98; Dkt. No. 2: Compl. ¶ 4.)  On March 12, 2008, the Social Security Administration ("SSA") conducted an initial review of Mejia's claim and found that he was not disabled.  (R. 40-43.)  On May 13, 2008, Mejia requested an administrative hearing.  (R. 45-46, 191-92.)

Administrative Law Judge ("ALJ") Robin J. Arzt conducted a hearing on May 14, 2009.  (R. 23-38.)  Mejia appeared at the hearing without an attorney.  (R. 23, 25-26.)  On May 28, 2009, ALJ Arzt issued a written decision finding that Mejia was not disabled.  (R. 6-22.)  ALJ Arzt's decision became the Commissioner's final decision when the Appeals Council denied Mejia's request for review on September 2, 2009.  (R. 1-3.)

The issue before the Court is whether the Commissioner's decision, that Mejia was not disabled between October 16, 2007 and May 28, 2009, is supported by substantial evidence.  The Court finds that it was.

### Non-Medical Evidence

Mejia was born on March 18, 1960 and was forty-seven years old at the alleged onset of his disability.  (R. 28.)  Mejia attended high school until the eleventh grade; he does not have a GED.  (R. 29, 118.)  Between 1999 and 2007, Mejia held a number of jobs, including mail room

clerk and radio dispatcher.  (R. 29, 101-05, 114.) Mejia's longest running and most relevant position was as a supervisory shipping and receiving clerk for a production editing company.  (R. 29-32, 101-02.)  During his seven years with the company, Mejia engaged in semi-skilled, exertionally heavy labor, lifting and transferring boxes weighing 50 to 100 pounds each.  (R. 29-31, 102, 114.)  Mejia also had limited supervisory duties over two other clerks in his department.  (R. 30, 102, 114.)  The company terminated Mejia when it went out of business on August 13, 2007, and Mejia has been unemployed ever since.  (R. 29, 32, 113.)

In October 2007, Mejia's dentist took Mejia's blood pressure and discovered that it was elevated.  (R. 32, 148.)  After an electrocardiogram, the dentist referred Mejia to Dr. Michael Huber for further testing.  (R. 28, 32, 141, 148-49.)  According to Mejia, Dr. Huber stated that despite "good" arteries, Mejia's heart was "messed up" because it was "bigger than it's supposed to be."  (R. 35-36.)  Mejia testified that Dr. Huber diagnosed him with "heart failure" resulting from his "ingrown heart."  (R. 35.)

In his November 2007 application for Social Security Disability Benefits, Mejia identified his daily activities as reading, watching television, attending doctors' appointments, caring for his personal hygiene, cleaning and ironing.  (R. 91-94, 128.)  Mejia spent thirty to sixty minutes cooking each day (R. 92), and spent forty-five minutes shopping at least once a month (R. 94). Mejia left his apartment daily and could walk up to thirty blocks.  (R. 93-94, 96.)  His social activities, which included playing cards, listening to music and attending church once a week, were unchanged.  (R. 95, 174.)  Indeed, the only activity Mejia stated that he was unable to do following his diagnosis was "work."  (R. 91.)

4

In January 2008, however, Mejia began experiencing shortness of breath, which prevented him from walking more than one and one half blocks, standing for more than twenty minutes and carrying a gallon of milk one block. (R. 27, 33, 36-37.) His shortness of breath also routinely interfered with his sleep. (R. 27, 33.) Mejia further testified that, although he experienced periodic chest pain prior to October 2007, the chest pains became more severe following his diagnosis, occurring at least once a week and lasting for up to 45 minutes. (R. 34-35.) Although Mejia experienced back pain when he bent over, he could sit, squat and use fine motor skills without incurring any symptoms. (R.37.)

Mejia testified that Dr. Huber prescribed Lipitor and other medication to "keep [Mejia's] arteries clean" and prevent him from "catching a stroke." (R. 36.) Mejia reported that the medications improved his condition and did not produce any adverse side effects. (R, 35.) His symptoms, however, did not abate. (R. 35.)

**Medical Evidence**

### **Treating Physicians**

Mejia's dentist conducted a physical examination in preparation for a tooth extraction and found that Mejia's blood pressure was elevated to 181/108. (R. 148.) The dentist referred Mejia to BronxCare Ogden Family Medical Center ("BronxCare"), where a physical examination performed on October 12, 2007 revealed that Mejia's blood pressure was 170/100. (R. 148.) The BronxCare examining physician diagnosed Mejia with "new onset hypertension" and prescribed a treatment regimen of hydrochlorothiazide and aspirin. (R. 148-49.) An EKG performed at Bronx Lebanon Hospital on October 12, 2007, the same day as Mejia's physical examination, showed

normal sinus rhythm, possible left atrial enlargement, left ventricular hypertrophy and a possible inferior infarct of undetermined age.[1]  (R. 118, 140, 149, 163-64.)

During a follow-up appointment at BronxCare on October 17, 2007, Dr. Virginia Martinez noted that Mejia had responded to medication, because his blood pressure had dropped to 141/94.  (R. 146.)  Dr. Martinez also determined that Mejia's LDL cholesterol levels were elevated and prescribed Lipitor, exercise and dietary changes.  (R. 117, 127,132-33,138,146-47, 159.)  After clearing him for the dental procedure, Dr. Martinez referred Mejia to Dr. Huber at Bronx Lebanon Hospital for further tests.  (R. 141, 147.)

On October 25, 2007, Mejia had an echocardiogram, which revealed a left atrium size of 3.8cm, a septal wall thickness of 1.7cm, a left ventricular end diastolic dimension of 5.6cm and a ventricular posterior wall thickness of 1.7cm.  (R. 186.)  Dr. Huber reviewed the results and determined that the echocardiogram showed a borderline dilated left ventricle with "eccentric left ventricular hypertrophy," moderate diffuse systolic dysfunction and an ejection fraction[2] of thirty-five to forty percent.  (R. 186.)  Although the echocardiogram also revealed "some evidence of abnormal diastolic relaxation," Dr. Huber deemed the results otherwise "unremarkable."  (R. 186.)

---

[1]      An "infarct" is an "area of coagulation necrosis in a tissue due to local ischemia resulting from obstruction of circulation to the area."  Dorland's Illustrated Medical Dictionary at 894 (29th ed. 2000).

[2]      An "ejection fraction" is the "proportion of the volume of blood in the ventricles at the end of diastole that is ejected during systole; it is the stroke volume divided by the end-diastolic volume, often expressed as a percentage."  Dorland's Illustrated Medical Dictionary at 708.

On November 20, 2007, Mejia underwent both a cardiac perfusion test[3/] and a nuclear exercise stress test at Bronx Lebanon Hospital. (R. 187-90.) During the exercise stress test, Mejia exercised to a maximum of 13.5 METs[4/] (R. 187-88), which was within normal or "[f]unctional [c]lass" I limits.[5/]  See American Medical Association, Guides to the Evaluation of Permanent Impairment at 171.  The test also showed "[n]ormal" myocardial perfusion as well as a "[n]ormal" heart rate and blood pressure response.  (R. 189.)  Nevertheless, the doctor who performed the test characterized the results as "[a]bnormal" because the stress test revealed moderate left ventricular dysfunction and global hypokinesis.  (R. 189.)

In an April 28, 2008 letter concerning Mejia's diagnosis, Dr. Huber stated that Mejia had "congestive heart failure" and "severe LV [left ventricular] dysfunction." (R. 185.)  Dr. Huber classified Mejia's symptoms as  New York Heart Association ("NYHA") Class II,  meaning that he

---

[3/]　　　"[P]erfusion" refers to the flow of blood through the heart.  See Dorland's Illustrated Medical Dictionary at 1350.

[4/]　　　"MET" represents the "multiples of resting metabolic energy used for any given activity," and is used to measure the excess energy expended during cardiac exercise.  American Medical Association, Guides to the Evaluation of Permanent Impairment at 170 (4th ed. 1999).

[5/]　　　"Functional Class 1" describes a patient who, despite the presence of cardiac disease, does not exhibit any resulting physical limitations, because exertion does not cause abnormal fatigue, palpitations, anginal pain or shortness of breath.  American Medical Association, Guides to the Evaluation of Permanent Impairment at 170.

had a slight, mild limitation of activity and was comfortable with rest or with mild exertion.[6]  (R. 185.)  Dr. Huber opined that Mejia's Class II symptoms would improve with medication.  (R. 185.)

In a May 6, 2009 follow-up letter, Dr. Huber re-classified Mejia's diagnosis as a "cardiomyopathy, which is idiopathic but possibly hypertensive in origin."[7]  (R. 194.)  Dr. Huber noted that although Mejia's hypertension had responded favorably to the prescribed medications (Avalide, Carvedilol and Lipitor) (R. 117, 174), his Class II symptoms persisted (R. 194).  Dr. Huber opined that Mejia would need medication for the "foreseeable future" and should refrain from work entailing "strenuous exertion."  (R. 194.)

**Consultative Physicians**

On January 10, 2008, consulting physician Dr. David Guttman examined Mejia.  (R. 174-77.)  Dr. Guttman's report stated that Mejia did not exhibit any "acute distress" and could get on and off the exam table and rise from a chair without any assistance or difficulty.  (R. 175.)  Despite a slightly elevated blood pressure of 142/102, Dr. Guttman noted that Mejia's exam showed an otherwise "[r]egular" heart rhythm and a normal point of maximal impulse ("PMI") in the left fifth intercostal space at the midclavicular line.  (R. 175.)  The examination did not reveal any audible

---

[6]  Patients with NYHA Class I symptoms have "no symptoms and no physical activity limits." (R. 13.)  Patients with NYHA Class II symptoms are "'patients with slight, mild limitation of activity; they are comfortable with rest or with mild exertion.'"  (R. 13.)  Patients with NYHA Class III symptoms, by contrast, exhibit "marked limitation" and are comfortable "'only at rest.'"  (R. 13.)  See generally American Medical Association, Guides to the Evaluation of Permanent Impairment at 170.

[7]  Cardiomyopathy is a disease of the heart muscle which limits the heart's ability to pump blood; a cardiomyopathy is "idiopathic" when the cause of the muscle damage is unknown. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.00(H)(3).

8

heart "murmur, gallop or rub." (R. 175.) Musculoskeletal tests confirmed that Mejia's ability to perform fine manual manipulation was normal. (R. 175-76.) Based on Mejia's medical history, Dr. Guttman diagnosed Mejia with hypertension and congestive heart failure, but concluded that his physical examination was otherwise within normal limits. (R. 176.) Dr. Guttman designated Mejia's prognosis as "[f]air." (R. 176.)

On March 11, 2008, consultative Physician Dr. D. Zanni performed a Residual Functional Capacity Assessment of Mejia based on his medical records. (R. 178-83.) Dr. Zanni concluded that Mejia could occasionally lift or carry 20 pounds and frequently lift or carry 10 pounds. (R. 179.) Dr. Zanni also concluded that Mejia could stand or walk for 6 hours in an 8 hour workday and sit for 6 hours in an 8 hour workday. (R. 179.) The factual basis for Dr. Zanni's conclusions was that Mejia's blood pressure was 142/102, and Mejia has "increased left ventricular mass. Moderately reduced systolic function. Ejection fraction 35-40%. . . . [N]o chest pains. . . . He has no shortness of breath. He is able to walk six blocks or 1 flight of stairs." (R. 179.) Dr. Zanni concluded that based on the information in his file, Mejia "has a moderately determinable impairment [that] limits [Mejia] to light [work]." (R. 181.)

**The ALJ's Decision**

In a decision dated May 28, 2009, ALJ Arzt denied Mejia's application for Disability Insurance Benefits and Supplemental Security Income Benefits for the period from October 16, 2007 to May 28, 2009. (R. 6-22.)

ALJ Arzt reviewed Mejia's claim of disability resulting from hypertension and heart failure, considering both Mejia's testimony and medical records. (R. 11-14.) ALJ Arzt concluded

that Mejia suffered from both hypertension and "controlled congestive heart failure from idiopathic vs. hypertensive cardiomyopathy." (R. 11.)  Although Mejia's "medically determinable impairments reasonably could be expected to produce some of the alleged symptoms and limitations," ALJ Arzt found that Mejia's testimony concerning the "intensity, persistence and limiting effects of these symptoms . . . [was] not entirely supported by the record." (R. 13.)

With these considerations in mind, ALJ Arzt applied the appropriate five step legal analysis (R. 10-11) as follows:  At the first step, ALJ Arzt found that Mejia had not "engaged in substantial gainful activity since October 16, 2007, the alleged disability onset date." (R. 11.)  At the second step, ALJ Arzt found that Mejia's congestive heart failure and hypertension "cause more than a minimal limitation [on his] ability to perform basic work related activities." (R. 11.)  At the third step, ALJ Arzt found that Mejia's impairments do not "meet[] or medically equal[] one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1." (R. 11.)  At the fourth step, ALJ Arzt determined that Mejia has the residual functional capacity to "occasionally lift and carry up to twenty pounds at a time, frequently lift and carry up to ten pounds at a time, walk and stand up to six hours out of an eight hour day, push and pull light weight objects, and occasionally bend and stoop." (R. 12.)  Based on Dr. Huber's determination that Mejia has Class II symptoms and should avoid "strenuous exertion," ALJ Arzt found that Mejia can perform "sedentary" or "light"work.[8]

---

[8]      Work in the national economy is classified according to the following rubric: (1)sedentary, (2) light, (3) medium, (4) heavy, and (5) very heavy. 20 C.F.R. § 404.1567(b). "Light work" entails "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds" and requires either "a good deal of walking or standing" or pushing or pulling of "arm or leg controls." 20 C.F.R. § 404.1567(b). Plaintiffs in the "light"
(continued...)

(R. 12-13.)  Because Mejia's "past relevant work" as a shipping and handling clerk required "exertionally heavy work," ALJ Artzt found that it exceeded Mejia's residual functional capacity. (R. 13-14.)  At the fifth and final step, ALJ Arzt utilized the Grid and concluded that based on Mejia's "age, education, past relevant work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Mejia] can perform."  (R. 14.) Accordingly, ALJ Arzt found that Mejia was "not disabled" from October 16, 2007 through May 28, 2009, and therefore was not entitled to receive disability benefits.  (R. 14-15.)

## ANALYSIS

## I.   THE APPLICABLE LAW

### A.   Definition of Disability

A person is considered disabled for Social Security benefits purposes when she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); see, e.g., Barnhart v. Thomas, 540 U.S. 20, 23, 124 S. Ct. 376, 379 (2003); Barnhart v. Walton, 535 U.S. 212, 214, 122 S. Ct. 1265, 1268 (2002); Salmini v. Comm'r of Soc. Sec., No. 09-3642-cv, 2010 WL 1170133 at *1 (2d Cir. Mar. 25, 2010); Betances v. Comm'r of Soc. Sec., 206

---

[8/]   (...continued)
work classification must be able to perform "substantially all of [the listed] activities."  20 C.F.R. § 404.1567(b).  Sedentary work involves sitting but also "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools."  20 C.F.R. §§ 404.1567(a).  Sedentary work may involve "a certain amount of walking and standing."  20 C.F.R. §§ 404.1567(a).

Fed. Appx. 25, 26 (2d Cir. 2006); Surgeon v. Comm'r of Soc. Sec., 190 Fed. Appx. 37, 39 (2d Cir. 2006); Rodriguez v. Barnhart, 163 Fed. Appx. 15, 16 (2d Cir. 2005); Malone v. Barnhart, 132 Fed. Appx. 940, 941 (2d Cir. 2005); Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005).[9]

> An individual shall be determined to be under a disability only if [the combined effects of] his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A)(B), 1382c(a)(3)(B)(G); see, e.g., Barnhart v. Thomas, 540 U.S. at 23, 124 S. Ct. at 379; Barnhart v. Walton, 535 U.S. at 218, 122 S. Ct. at 1270; Salmini v. Comm'r of Soc. Sec., 2010 WL 1170133 at *1; Betances v. Comm'r of Soc. Sec., 206 Fed. Appx. at 26; Butts v. Barnhart, 388 F.3d at 383; Draegert v. Barnhart, 311 F.3d at 472.[10]

In determining whether an individual is disabled for disability benefit purposes, the Commissioner must consider:  "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts;  (3) subjective evidence of pain or disability testified to by the claimant or

---

[9]   See also, e.g., Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).

[10]   See also, e.g., Shaw v. Chater, 221 F.3d at 131-32; Rosa v. Callahan, 168 F.3d at 77; Balsamo v. Chater, 142 F.3d at 79.

others; and (4) the claimant's educational background, age, and work experience." Mongeur v.

Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).[11]

B.      **Standard of Review**

A court's review of the Commissioner's final decision is limited to determining

whether there is "substantial evidence" in the record to support such determination. E.g., Salmini

v. Comm'r of Soc. Sec., No. 09-3642-cv, 2010 WL 1170133 at *1 (2d Cir. Mar. 25, 2010); Acierno

v. Barnhart, 475 F.3d 77, 80-81 (2d Cir.), cert. denied, 551 U.S. 1132, 127 S. Ct. 2981 (2007);

Halloran v. Barnhart 362 F.3d 28, 31 (2d Cir. 2004), Jasinski v. Barnhart, 341 F.3d 182, 184 (2d Cir.

2003); Green-Younger v. Barnhart, 335 F.3d 99, 105-06 (2d Cir. 2003); 42 U.S.C. § 405(g).[12]

"'Thus, the role of the district court is quite limited and substantial deference is to be afforded the

---

[11]      See, e.g., Brunson v. Callahan, No. 98-6229, 199 F.3d 1321 (table), 1999 WL 1012761 at
*1 (2d Cir. Oct. 14, 1999); Brown v. Apfel, 174 F.3d at 62; Carroll v. Sec'y of Health &
Human Servs., 705 F.2d 638, 642 (2d Cir. 1983).

[12]      See also, e.g., Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Vapne v. Apfel, 36 Fed.
Appx. 670, 672 (2d Cir.), cert. denied, 537 U.S. 961, 123 S. Ct. 394 (2002); Horowitz v.
Barnhart, 29 Fed. Appx. 749, 752 (2d Cir. 2002); Machadio v. Apfel, 276 F.3d 103, 108 (2d
Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59,
61 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Rosa v. Callahan, 168
F.3d 72, 77 (2d Cir. 1999); Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998); Perez v.
Chater, 77 F.3d 41, 46 (2d Cir. 1996); Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991);
Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983); Dumas v. Schweiker, 712 F.2d
1545, 1550 (2d Cir. 1983); Rodriguez v. Barnhart, 03 Civ. 7272, 2004 WL 1970141 at *8
(S.D.N.Y. Aug. 23, 2004), aff'd, 163 Fed. Appx. 15 (2d Cir. 2005).

Commissioner's decision.'" <u>Morris</u> v. <u>Barnhardt</u>, 02 Civ. 0377, 2002 WL 1733804 at *4 (S.D.N.Y. July 26, 2002).[13]

   The Supreme Court has defined "substantial evidence" as "'more than a mere scintilla [and] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Richardson</u> v. <u>Perales</u>, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971); <u>accord</u>, <u>e.g.</u>, <u>Comins</u> v. <u>Astrue</u>, No. 09-2221-cv, 2010 WL 1490067 at *1 (2d Cir. Apr. 15, 2010); <u>Rosa</u> v. <u>Callahan</u>, 168 F.3d at 77; <u>Tejada</u> v. <u>Apfel</u>, 167 F.3d at 773-74.[14] "[F]actual issues need not have been resolved by the [Commissioner] in accordance with what we conceive to be the preponderance of the evidence." <u>Rutherford</u> v. <u>Schweiker</u>, 685 F.2d 60, 62 (2d Cir. 1982), <u>cert. denied</u>, 459 U.S. 1212, 103 S. Ct. 1207 (1983).  The Court must be careful not to "'substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a <u>de novo</u> review.'" <u>Jones</u> v. <u>Sullivan</u>, 949 F.2d 57, 59 (2d Cir. 1991).[15]  However, the Court will not defer to

---

[13]  <u>See also</u>, <u>e.g.</u>, <u>Duran</u> v. <u>Barnhart</u>, 01 Civ. 8307, 2003 WL 103003 at *9 (S.D.N.Y. Jan. 7, 2003); <u>Florencio</u> v. <u>Apfel</u>, 98 Civ. 7248, 1999 WL 1129067 at *5 (S.D.N.Y. Dec. 9, 1999) ("The Commissioner's decision is to be afforded considerable deference; the reviewing court should not substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review.") (quotations & alterations omitted).

[14]  <u>See also</u>, <u>e.g.</u>, <u>Halloran</u> v. <u>Barnhart</u>, 362 F.3d at 31; <u>Jasinski</u> v. <u>Barnhart</u>, 341 F.3d at 184; <u>Green-Younger</u> v. <u>Barnhart</u>, 335 F.3d at 106; <u>Veino</u> v. <u>Barnhart</u>, 312 F.3d at 586; <u>Shaw</u> v. <u>Chater</u>, 221 F.3d at 131; <u>Curry</u> v. <u>Apfel</u>, 209 F.3d at 122; <u>Brown</u> v. <u>Apfel</u>, 174 F.3d at 61; <u>Perez</u> v. <u>Chater</u>, 77 F.3d at 46.

[15]  <u>See also</u>, <u>e.g.</u>, <u>Colling</u> v. <u>Barnhart</u>, 254 Fed. Appx. 87, 88 (2d Cir. 2007); <u>Veino</u> v. <u>Barnhart</u>, 312 F.3d at 586; <u>Toles</u> v. <u>Chater</u>, No. 96-6065, 104 F.3d 351 (table), 1996 WL 545591 at *1 (2d Cir. Sept. 26, 1996).

14

the Commissioner's determination if it is "'the product of legal error.'"  <u>E.g.</u>, <u>Duvergel</u> v. <u>Apfel</u>, 99

Civ. 4614, 2000 WL 328593 at *7 (S.D.N.Y. Mar. 29, 2000) (Peck, M.J.); <u>see also</u>, <u>e.g.</u>, <u>Butts</u> v.

<u>Barnhart</u>, 388 F.3d 377, 384 (2d Cir. 2004), <u>amended on other grounds</u>, 416 F.3d 101 (2d Cir. 2005);

<u>Tejada</u> v. <u>Apfel</u>, 167 F.3d at 773 (citing cases).

        The Commissioner's regulations set forth a five-step sequence to be used in evaluating

disability claims.  20 C.F.R. §§ 404.1520, 416.920; <u>see</u>, <u>e.g.</u>, <u>Barnhart</u> v. <u>Thomas</u>, 540 U.S. 20, 24-

25, 124 S. Ct. 376, 379-80 (2003); <u>Bowen</u> v. <u>Yuckert</u>, 482 U.S. 137, 140, 107 S. Ct. 2287, 2291

(1987).  The Supreme Court has articulated the five steps as follows:

> Acting pursuant to its statutory rulemaking authority, 42 U.S.C. §§ 405(a) (Title II), 1383(d)(1) (Title XVI), the agency has promulgated regulations establishing a five-step sequential evaluation process to determine disability.  <u>See</u> 20 CFR § 404.1520 (2003) (governing claims for disability insurance benefits); § 416.920 (parallel regulation governing claims for Supplemental Security Income).  If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further.  [1] At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity."  §§ 404.1520(b), 416.920(b).  [2] At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities."  §§ 404.1520(c), 416.920(c).  [3] At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies.  §§ 404.1520(d), 416.920(d).  [4] If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled.  [5] If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.  §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

Barnhart v. Thomas, 540 U.S. at 24-25, 124 S. Ct. at 379-80 (fns. omitted);[16] accord, e.g., Salmini v. Comm'r of Soc. Sec., 2010 WL 1170133 at *1; Williams v. Comm'r of Soc. Sec., 236 Fed. Appx. 641, 643 (2d Cir. 2007); Betances v. Comm'r of Soc. Sec., 206 Fed. Appx. at 26; Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 774.[17]

The claimant bears the burden of proof as to the first four steps; if the claimant meets the burden of proving that she cannot return to her past work, thereby establishing a prima facie case, the Commissioner then has the burden of proving the last step, that there is other work the claimant can perform considering not only her medical capacity but also her age, education and training. See, e.g., Barnhart v. Thomas, 540 U.S. at 25, 124 S. Ct. at 379-80.[18]

---

[16] Amendments to 20 C.F.R. 404.1520 became effective September 25, 2003. See 68 Fed. Reg. 51153, 2003 WL 22001943 (Aug. 26, 2003); see also Barnhart v. Thomas, 540 U.S. at 25 n.2, 124 S. Ct. at 380 n.2. The amendments, inter alia, added a new § 404.1520(e) and redesignated previous §§ 404.1520(e) and (f) as §§ 404.1520(f) and (g), respectively. 20 C.F.R. § 404.1520; see 68 Fed. Reg. 51156. The new § 404.1520(e) explains that if the claimant has an impairment that does not meet or equal a listed impairment, the SSA will assess the claimant's residual functional capacity. 20 C.F.R. § 404.1520(e). The SSA uses the residual functional capacity assessment at step four to determine whether the claimant can perform past relevant work and, if necessary, at step five to determine whether the claimant can do any work. See 68 Fed. Reg. 51156.

[17] See also, e.g., Jasinski v. Barnhart, 341 F.3d at 183-84; Green-Younger v. Barnhart, 335 F.3d at 106; Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); Shaw v. Chater, 221 F.3d at 132; Brown v. Apfel, 174 F.3d at 62; Balsamo v. Chater, 142 F.3d at 79-80; Schaal v. Apfel, 134 F.3d at 501; Perez v. Chater, 77 F.3d at 46; Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).

[18] See also, e.g., Salmini v. Comm'r of Soc. Sec., 2010 WL 1170133 at *2; Williams v. Comm'r of Soc. Sec., 236 Fed. Appx. at 643; Betances v. Comm'r of Soc. Sec., 206 Fed. Appx. at 26; Green-Younger v. Barnhart, 335 F.3d at 106; Draegert v. Barnhart, 311 F.3d at 472; Rosa v. Callahan, 168 F.3d at 80; Perez v. Chater, 77 F.3d at 46; Berry v. Schweiker, 675 F.2d
(continued...)

**C.      The Treating Physician Rule**

The "treating physician's rule" is a series of regulations set forth by the Commissioner in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion. Specifically, the Commissioner's regulations provide that:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(d)(2); see, e.g., Meadors v. Astrue, No. 09-3545-cv, 2010 WL 1048824 at *2 (2d Cir. Mar. 23, 2010); Colling v. Barnhart, 254 Fed. Appx. 87, 89 (2d Cir. 2007); Lamorey v. Barnhart, 158 Fed. Appx. 361, 362 (2d Cir. 2006).[19]

Further, the regulations specify that when controlling weight is not given a treating physician's opinion (because it is not "well supported" by other medical evidence), the Court should consider the following factors in determining the weight to be given such an opinion:  (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how

---

[18]      (...continued)
464, 467 (2d Cir. 1982).

[19]      See also, e.g., Foxman v. Barnhart, 157 Fed. Appx. 344, 346 (2d Cir. 2005); Tavarez v. Barnhart, 124 Fed. Appx. 48, 49 (2d Cir. 2005); Donnelly v. Barnhart, 105 Fed. Appx. 306, 308 (2d Cir. 2004); Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004); Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Kamerling v. Massanari, 295 F.3d 206, 209 n.5 (2d Cir. 2002); Jordan v. Barnhart, 29 Fed. Appx. 790, 792 (2d Cir. 2002); Bond v. Soc. Sec. Admin., 20 Fed. Appx. 20, 21 (2d Cir. 2001); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000); Rosa v. Callahan, 168 F.3d 72, 78-79 (2d Cir. 1999); Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998); Schaal v. Apfel, 134 F.3d 496, 503 (2d Cir. 1998).

consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other factors which may be significant. 20 C.F.R. § 404.1527(d)(2); see, e.g., Gunter v. Comm'r of Soc. Sec., No. 08-5544-cv, 2010 WL 145273 at *1 (2d Cir. Jan. 15, 2010); Foxman v. Barnhart, 157 Fed. Appx. at 346-47; Halloran v. Barnhart, 362 F.3d at 32; Shaw v. Chater, 221 F.3d at 134; Clark v. Comm'r, 143 F.3d at 118; Schaal v. Apfel, 134 F.3d at 503.[20]

The Commissioner's "treating physician" regulations were approved by the Second Circuit in Schisler v. Sullivan, 3 F.3d 563, 568 (2d Cir. 1993).

## II. APPLICATION OF THE FIVE STEP SEQUENCE TO MEJIA'S CLAIMS

The Court must determine if the Commissioner's decision that Mejia was not disabled during the relevant period from October 16, 2007 (the alleged onset date) through May 28, 2009 (the date ALJ Arzt denied Mejia's claim), was supported by substantial evidence. The Commissioner's decision that Mejia was not disabled is affirmed since it is supported by substantial evidence.

### A. Mejia Was Not Engaged in Substantial Gainful Activity

The first inquiry is whether Mejia was engaged in substantial gainful activity after his applications for Disability Insurance Benefits and Supplemental Security Income. "Substantial gainful activity" is defined as work that involves "doing significant and productive physical or mental duties" and "[i]s done (or intended) for pay or profit." 20 C.F.R. § 404.1510. ALJ Arzt's

---

[20]   See also, e.g., Kugielska v. Astrue, 06 Civ. 10169, 2007 WL 3052204 at *8 (S.D.N.Y. Oct. 16, 2007); Hill v. Barnhart, 410 F. Supp. 2d 195, 217 (S.D.N.Y. 2006); Klett v. Barnhart, 303 F. Supp. 2d 477, 484 (S.D.N.Y 2004); Rebull v. Massanari, 240 F. Supp. 2d 265, 268 (S.D.N.Y. 2002).

18

conclusion that Mejia was not engaged in substantial gainful activity during the applicable time period (see page 9 above) benefits Mejia and is not disputed.

**B.     Mejia Demonstrated "Severe" Physical and Mental Impairments That Significantly Limited His Ability To Do Basic Work Activities**

The next step of the analysis is to determine whether Mejia proved that he had a severe impairment or combination of impairments that "significantly limit[ed his] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). "Basic work activities" include:

> . . . walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling . . . seeing, hearing, and speaking . . .[u]nderstanding, carrying out, and remembering simple instructions . . .[u]se of judgment . . .[r]esponding appropriately to supervision, co-workers and usual work situations.

20 C.F.R. § 404.1521(b)(1)-(5). The Second Circuit has warned that the step two analysis may not do more than "screen out de minimis claims." Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir. 1995).

"A finding that a condition is not severe means that the plaintiff is not disabled, and the Administrative Law Judge's inquiry stops at the second level of the five-step sequential evaluation process." Rosario v. Apfel, No. 97 CV 5759, 1999 WL 294727 at *5 (E.D.N.Y. Mar. 19, 1999) (citing). On the other hand, if the disability claim rises above the de minimis level, then the further analysis of step three and beyond must be undertaken. See, e.g., Dixon v. Shalala, 54 F.3d at 1030.

"A finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to

work.'"  Rosario v. Apfel, 1999 WL 294727 at *5 (quoting Bowen v. Yuckert, 482 U.S. 137, 154 n.12, 107 S. Ct. 2287, 2298 n.12 (1987)).

ALJ Arzt determined that the medical evidence indicated that Mejia's impairments, hypertension and "controlled congestive heart failure resulting from idiopathic vs. hypertensive cardiomyopathy," were severe within the meaning of 20 C.F.R. § 404.1520(c).  (See page 9 above). These findings benefit Mejia and are not disputed.  The Court therefore proceeds to the third step of the five part analysis.

**C.**      **Mejia Did Not Have A Disability Listed in Appendix 1 of the Regulations**

The third step of the five-part test requires a determination of whether Mejia had an impairment listed in Appendix 1 of the Regulations.  20 C.F.R., Pt. 404, Subpt. P, App. 1.  "These are impairments acknowledged by the [Commissioner] to be of sufficient severity to preclude gainful employment.  If a claimant's condition meets or equals the 'listed' impairments, he or she is conclusively presumed to be disabled and entitled to benefits."  Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995).

Based on the medical record, ALJ Arzt correctly determined that Mejia suffered from both hypertension and controlled congestive heart failure resulting from idiopathic cardiomyopathy. (See page 9 above.)  ALJ Arzt found, however, that while Mejia's medically determinable impairments were "severe," he did "not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (R. 11; see page 9 above.)  The medical evidence supports that finding.

### 1.   Cardiomyopathy

Cardiomyopathy is evaluated under Section 4.00 of Appendix 1, as explained in the section entitled "Evaluating Other Cardiovascular Impairments":

> Cardiomyopathy is a disease of the heart muscle.  The heart loses its ability to pump blood (heart failure), and in some instances, heart rhythm is disturbed, leading to irregular heartbeats (arrhythmias).  Usually, the exact cause of the muscle damage is never found (idiopathic cardiomyopathy). . . .  We will evaluate cardiomyopathy under [§§] 4.02, 4.04, 4.05 or 11.04, depending on its effects on you.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 4.00(H)(3).  Because there is no evidence in the record that Mejia was diagnosed with or suffered from any of the conditions listed in sections 4.04 (ischemic heart disease), 4.05 (recurrent arryhthmias) or 11.04 (central nervous system vascular accident), for Mejia's cardiomyopathy to qualify as listed impairment, it must satisfy section 4.02 (chronic heart failure).  Section 4.02 requires the following:

> 4.02 Chronic heart failure while on a regimen of prescribed treatment, with symptoms and signs described in 4.00D2 [easy fatigue, weakness and shortness of breath]. The required level of severity for this impairment is met when the requirements in both A and B are satisfied.
>
> A. Medically documented presence of one of the following:
>
> 1. Systolic failure (see 4.00D1a(i)), with left ventricular end diastolic dimensions greater than 6.0 cm or ejection fraction of 30 percent or less during a period of stability (not during an episode of acute heart failure); or
>
> 2. Diastolic failure (see 4.00D1a(ii)), with left ventricular posterior wall plus septal thickness totaling 2.5 cm or greater on imaging, with an enlarged left atrium greater than or equal to 4.5 cm, with normal or elevated ejection fraction during a period of stability (not during an episode of acute heart failure);
>
> AND
>
> B. Resulting in one of the following:

1. Persistent symptoms of heart failure which very seriously limit the ability to independently initiate, sustain, or complete activities of daily living in an individual for whom an MC, preferably one experienced in the care of patients with cardiovascular disease, has concluded that the performance of an exercise test would present a significant risk to the individual; or

2. Three or more separate episodes of acute congestive heart failure within a consecutive 12-month period (see 4.00A3e), with evidence of fluid retention (see 4.00D2b(ii)) from clinical and imaging assessments at the time of the episodes, requiring acute extended physician intervention such as hospitalization or emergency room treatment for 12 hours or more, separated by periods of stabilization (see 4.00D4c); or

3. Inability to perform on an exercise tolerance test at a workload equivalent to 5 METs or less due to:

a. Dyspnea, fatigue, palpitations, or chest discomfort; or

b. Three or more consecutive premature ventricular contractions (ventricular tachycardia), or increasing frequency of ventricular ectopy with at least 6 premature ventricular contractions per minute; or

c. Decrease of 10 mm Hg or more in systolic pressure below the baseline systolic blood pressure or the preceding systolic pressure measured during exercise (see 4.00D4d) due to left ventricular dysfunction, despite an increase in workload; or

d. Signs attributable to inadequate cerebral perfusion, such as ataxic gait or mental confusion.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 4.02.

Even if the chronic shortness of breath and easy fatigue that Mejia claims to suffer (see page 4 above) satisfies § 4.00(D)(2)(i)'s list of signs and symptoms, Mejia's condition does not satisfy subsections 4.02(A) or (B), much less satisfy both of those subsections.

As to subsection 4.02(A), the medical record does not support a finding of either systolic or diastolic failure.[21/]  With regard to § 4.02(A)(1), systolic failure, the medical record must evidence "left ventricular end diastolic dimensions greater than 6.0 cm or ejection fraction of 30 percent or less."  20 C.F.R., Pt. 404, Subpt. P, App. 1, § 4.02(A)(1).  Mejia's October 2007 echocardiogram, however, revealed a left ventricular end diastolic measurement of 5.6cm (see page 5 above), which is less than § 4.02(A)(1)'s 6cm threshold, and Mejia had an ejection fraction of 35 to 40 percent (see page 5 above), which is above § 4.02(A)(1)'s requisite 30 percent or less.

As to § 4.02(A)(2), although Mejia's combined left ventricular posterior and septal wall thickness totals 3.4cm (see page 5 above), placing him in § 4.02(A)(2)'s "2.5 cm or greater" range, his left atrium measurement of 3.8 cm (see page 5 above) is less than the "4.5 cm or greater" needed to qualify for diastolic failure under § 4.02(A)(2).  Moreover, Mejia's 35 to 40 percent ejection fraction is below the requisite "normal" range.[22/]  Accordingly, Mejia does not satisfy subsection 4.02(A).

---

[21/]   Systolic failure, the "inability of the heart to contract normally and expel sufficient blood" is characterized by "a dilated, poorly contracting left ventricle and reduced ejection fraction."  20 C.F.R., Pt. 404, Subpt. P, App. 1, § 4.00(D)(1)(i).  Diastolic failure, by contrast, is the "inability of the heart to relax and fill normally" and is characterized by "a thickened ventricular muscle, poor ability of the left ventricle to distend, increased ventricular filling pressure, and a normal or increased EF [ejection fraction]."  Id., § 4.00(D)(1)(ii).

[22/]   A "normal" ejection fraction is greater than 55%.  By contrast, an ejection fraction between 30% and 40% indicates moderate systolic dysfunction and an ejection fraction below 30% demonstrates severe systolic dysfunction.  American Medical Association, Guides to the Evaluation of Permanent Impairment at 170; see also Sheehan v. Metro. Life Ins. Co., 368 F. Supp. 2d 228, 248 n.12 (S.D.N.Y. 2005).

In addition, Mejia does not meet subsection 4.02(B)'s requirements.  With respect to § 4.02(B)(1), Mejia's NYHA Class II symptoms, which place only "mild limitation[s] on [his daily] activit[ies]" (see pages 6-7 above), do not rise to the level of "[p]ersistent symptoms of heart failure which very seriously limit the ability to independently initiate, sustain, or complete activities of daily living."  20 C.F.R., Pt. 404, Subpt. P, App. 1, § 4.02(B)(1).  Indeed, Mejia reported that he engaged in a range of daily activities, including shopping, household chores, cooking and socializing.  (See page 3 above.)  Also, § 4.02(B)(1) applies where a doctor concludes the patient cannot safely perform an "exercise test," and Mejia had such a stress exercise test.  (See page 6 above.)

As to subsection 4.02(B)(2)'s requirement that the patient have at least three documented occurrences of acute congestive heart failure requiring extensive hospitalization or treatment, Mejia's record is devoid of any such instances.  (See pages 4-8 above.)  Likewise, Mejia did not satisfy subsection 4.02(B)(3)'s requirement that the patient have an "inability to perform on an exercise tolerance test at a workload equivalent to 5 METs or less," because Mejia exercised to a maximum of 13.5 METs during his November 2007 stress test (see page 6 above).

Accordingly, substantial evidence supports ALJ Arzt's determination that Mejia's controlled congestive heart failure resulting from an idiopathic cardiomyopathy does not meet the Listing requirements.

### 2.  **Hypertension**

With regard to Mejia's hypertension, ALJ Arzt found that although severe, it did not meet or medically equal one of the Listed impairments.  (See page 9 above.)  The medical evidence supports that finding.

Hypertension is also evaluated under Section 4.00 of Appendix 1, as explained in a section entitled "Evaluating Other Cardiovascular Impairments":

> Because hypertension (high blood pressure) generally causes disability through its effects on other body systems, we will evaluate it by reference to the specific body system(s) affected (heart, brain, kidneys, or eyes) when we consider its effects under the listings.  We will also consider any limitations imposed by your hypertension when we assess your residual functional capacity.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 4.00(H)(1).

During the period in question, there is limited evidence that Mejia's hypertension restricted his lifestyle.  Although Dr. Huber noted in his May 2009 letter that despite successful treatment of the hypertension, Mejia's NYHA Class II symptoms persisted (see page 7 above), ALJ Arzt expressed doubt that the "intensity, persistence and limiting effects" of the symptoms Mejia described at the hearing were consistent with the medical record.  (See page 9 above.)  Between October 2007 and May 2009, Mejia's blood pressure readings fluctuated but appeared to respond to treatment.  (See pages 5-7 above.)  Mejia testified that he could engage in a range of daily activities, including household chores, personal hygiene and socialization.  (See page 3 above.)  Because Mejia's hypertension responded favorably to treatment and he could participate in a variety of non-strenuous activities, ALJ Arzt correctly concluded that it was not disabling.  See e.g., Garner v. Astrue, 08 Civ. 6367, 2009 WL 903742 at *17 (S.D.N.Y. Apr. 6, 2009) (Peck, M.J.) (hypertension did not satisfy Appendix 1 where there was no evidence that it "produce[d] any effects (primary or secondary) that severely impaired other bodily systems."), report & rec. adopted in part, 2009 WL 1911744 (S.D.N.Y. Jun. 30, 2009); Anderson v. Astrue, 07 Civ. 7195, 2008 WL 655605 at *14 (S.D.N.Y. Mar. 12, 2008) (Peck, M.J.), report & rec. adopted, 2008 WL 2463885 (S.D.N.Y. Jun. 18,

2008); Nunez v. Barnhart, 05 Civ. 9221,  2007 WL 313459 at *6-7 (S.D.N.Y. Feb. 1, 2007)

(plaintiff's hypertension was asymptomatic, controlled by medication, and did not affect plaintiff's

ability to perform basic work activities); Snipe v. Barnhart, 05 Civ. 10472, 2006 WL 2390277 at *15

(S.D.N.Y. Aug. 21, 2006) (Peck, M.J.) (plaintiff's hypertension not disabling where it was under

control due to medication), report & rec. adopted, 2006 WL 2621093 (S.D.N.Y. Sept. 12, 2006);

Lowe v. Barnhart, 04 Civ. 9012, 2006 WL 1911020 at *7-8 (S.D.N.Y. July 10, 2006) (plaintiff's

hypertension not a severe impairment where controlled through medication and plaintiff could

perform a variety of daily activities); Tillackdharry v. Barnhart, 05 Civ. 6639, 2006 WL 903191 at

*5 (S.D.N.Y. Apr. 10, 2006) (plaintiff's hypertension not disabling where controlled by medication

and he had the residual functional capacity to perform a significant range of light work).

        Substantial evidence supports ALJ Arzt's determination that Mejia's hypertension and

controlled cardiomyopathy did not meet the requirements of the listed impairments in Appendix 1.

### D.     Mejia Did Not Have the Ability to Perform His Past Work

        The fourth prong of the five part analysis is whether Mejia had the residual functional

capacity to perform his past relevant work.  (See page 10 above.)  After considering Dr. Huber's

opinion that Mejia should refrain from any work involving "strenuous exertion," ALJ Arzt

determined that Mejia was unable to resume his past work as a shipping and receiving clerk.  (See

page 10 above.)  Since this finding favors Mejia, the Court proceeds to the fifth and final step of the

analysis.

E.      **Mejia Can Perform Other Work In The Economy**

In the fifth step, the burden shifts to the Commissioner, "who must produce evidence to show the existence of alternative substantial gainful work which exists in the national economy and which the claimant could perform, considering not only his physical capability, but as well his age, his education, his experience and his training."  Parker v. Harris, 626 F.2d 225, 231 (2d Cir. 1980); see, e.g., Arruda v. Comm'r of Soc. Sec., No. 08-3128-CV, 2010 WL 324002 at *2 (2d Cir. Jan. 29, 2010); Butts v. Barnhart, 388 F.3d 377, 381 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999).[23/]

In meeting his burden under the fifth step, the Commissioner ordinarily will make use of the "Grid":

> In meeting [his] burden of proof on the fifth step of the sequential evaluation process described above, the Commissioner, under appropriate circumstances, may rely on the medical-vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, commonly referred to as "the Grid."  The Grid takes into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience.  Based on these factors, the Grid indicates whether the claimant can engage in any other substantial gainful work which exists in the national economy. Generally the result listed in the Grid is dispositive on the issue of disability.

---

[23/]     See also, e.g., Rosado v. Astrue, 00 Civ. 4095, 2010 WL 2011615 at *16 & n.17 (S.D.N.Y. May 20, 2010) (Peck, M.J.); De Roman v. Barnhart, 03 Civ. 0075, 2003 WL 21511160 at *16-17  (S.D.N.Y. July 2, 2003) (Peck, M.J.); Alvarez v. Barnhardt, 02 Civ. 3121, 2002 WL 31663570 at *11 (S.D.N.Y. Nov. 26, 2002) (Peck, M.J.), report & rec. adopted, 2003 WL 272063 (S.D.N.Y. Jan. 16, 2003); Morel v. Massanari, 01 Civ. 0186, 2001 WL 776950 at *11 (S.D.N.Y. July 11, 2001) (Peck, M.J.); Vega v. Comm'r, 97 Civ. 6438, 1998 WL 255411 at *10 (S.D.N.Y. May 20, 1998) (Peck, M.J.); Pickering v. Chater, 951 F. Supp. 418, 425 (S.D.N.Y. 1996) (Batts, D.J. & Peck, M.J.);  DeJesus v. Shalala, 94 Civ. 0772, 1995 WL 812857 at *6-7 (S.D.N.Y. June 14, 1995) (Peck, M.J.), report & rec. adopted, 899  F. Supp. 1171 (S.D.N.Y. 1995).

Zorilla v. Chater, 915 F. Supp. 662, 667 (S.D.N.Y. 1996) (fns. omitted); see, e.g., Heckler v. Campbell, 461 U.S. 458, 461-62, 465-68, 103 S. Ct. 1952, 1954-55, 1956-58 (1983) (upholding the promulgation of the Grid); Martin v. Astrue, 337 Fed. Appx. 87, 90 (2d Cir. 2009); Rosa v. Callahan, 168 F.3d at 78; Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986). "The Grid classifies work into five categories based on the exertional requirements of the different jobs.  Specifically, it divides work into sedentary, light, medium, heavy and very heavy, based on the extent of requirements in the primary strength activities of sitting, standing, walking, lifting, carrying, pushing, and pulling." Zorilla v. Chater, 915 F. Supp. at 667 n.2; see 20 C.F.R. § 404.1567(a); see also pages 9-10 n.8 above.  Taking account of the claimant's residual functional capacity, age, education, and prior work experience, the Grid yields a decision of "disabled" or "not disabled."  20 C.F.R. § 404.1569, § 404 Subpt. P, App. 2, 200.00(a).

> ALJ Arzt determined that Mejia had the residual functional capacity to
>
> occasionally lift and carry up to twenty pounds at a time, frequently lift and carry up to ten pounds at a time, walk and stand up to six hours out of an eight hour day, push and pull light weight objects, and occasionally bend and stoop, which is consistent with an ability to perform light work.

(R. 19.)  The ALJ noted that "light work" includes sedentary work and can require either "a good deal of walking or standing" or "sitting most of the time with some pushing and pulling of arm or leg controls."  (R. 19; see page 9 above.)  In making this determination, ALJ Arzt did not credit Mejia's subjective complaints.  (See page 9 above.)  Although Mejia testified at the hearing that he experienced shortness of breath after walking one and one-half blocks and was unable to stand for more than twenty minutes, Mejia initially stated in his application for disability benefits that he could walk up to thirty blocks and spent forty-five minutes shopping once a month.  (See page 3 above.)

Mejia also stated that he could sit, squat and use fine motor skills without any problem.  (See page 4 above.)   Indeed, Mejia noted in his application that the only activity he was incapable of performing was "work."  (See page 3 above.)

Because subjective symptoms like pain and shortness of breath only lessen a claimant's residual functional capacity, where the symptoms "'can reasonably be accepted as consistent with the objective medical evidence and other evidence,' the ALJ is not required to accept allegations regarding the extent of symptoms that are inconsistent with the claimant's statements or similar evidence."  Moulding v. Astrue, 08 Civ. 9824, 2009 WL 3241397 at *7 (S.D.N.Y. Oct. 8, 2009) (citation & emphasis omitted); see also, e.g., Brown v. Comm'r of Soc. Sec., 310 Fed. Appx. 450, 451 (2d Cir. 2009) ("Where there is conflicting evidence about a claimant's pain, the ALJ must make credibility findings."); Rivers v. Astrue, 280 Fed. Appx. 20, 22 (2d Cir. 2008) (same); Thompson v. Barnhart, 75 Fed. Appx. 842, 845 (2d Cir. 2003) (The ALJ properly found that plaintiff's "description of her symptoms was at odds with her treatment history, her medication regime and her daily routine."); Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999); Astolos v. Astrue, No. 06-CV-678, 2009 WL 3333234 at *12 (W.D.N.Y. Oct. 14, 2009) (The ALJ properly determined that plaintiff's subjective pain complaints were not supported by the medical record.); Speruggia v. Astrue, No. 05-CV-3532, 2008 WL 818004 at *11 (E.D.N.Y. Mar. 26,  2008) ("The ALJ 'does not have to accept plaintiff's subjective testimony about her symptoms without question' and should determine a plaintiff's credibility 'in light of all the evidence.'"); Soto v. Barnhart, 01 Civ. 7905, 2002 WL 31729500 at *6 (S.D.N.Y. Dec. 4, 2002) ("The ALJ has the capacity and the discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical

findings and other evidence, regarding the true extent of pain alleged by the claimant."); Brandon

v. Bowen, 666 F. Supp. 604, 608 (S.D.N.Y. 1987) (same).

ALJ Arzt was justified by the medical evidence in discounting Mejia's subjective

testimony.  Mejia's treating physician Dr. Huber classified Mejia's symptoms as NYHA Class II,

meaning that Mejia had a "slight, mild limitation of activity" and was "comfortable with rest or with

mild exertion," but should refrain only from work involving "strenuous exertion."  (See page 7

above.)  In addition, consultative physician Dr. Zanni, based on the medical evidence in the file,

concluded that Mejia was limited to light work.  (See page 8 above.)  Accordingly, ALJ Arzt's

evaluation of Mejia's residual function capacity is supported by the record.

Reference to the Grid demonstrates that a person of Mejia's age (forty-seven years

old) (see page 2 above), education (eleventh grade, without a high school equivalency) (see page 2

above), and ability to perform light exertional work (see pages 8-9 above), is not disabled for

purposes of Social Security Benefits.  See 20 C.F.R. 404, Subpt. P, App. 2, §§ 201.18-19, 202.18-19.

The ALJ's decision that Mejia was not disabled for purposes of Social Security

Benefits is supported by substantial evidence.

## CONCLUSION

For the reasons set forth above, the Commissioner's determination that Mejia was not

disabled within the meaning of the Social Security Act during the period October 16, 2007 through

30

May 28, 2009, is supported by substantial evidence.  The Commissioner's motion for judgment on

the pleadings (Dkt. No. 12) is GRANTED.  The Clerk of Court shall enter judgment accordingly.

SO ORDERED

Dated:      New York, New York
            June 28, 2010

_____
**Andrew J. Peck**
United States Magistrate Judge

Copies to:   Joseph Mejia (Regular & Certified Mail)
             A.U.S.A. John E. Gura Jr., Esq.